Yes, thank you. Thank you. May it please the Court. Counsel. Good morning, Your Honors. My name is Leah Wigrin. I represent the Paul and Eric Sudduth. And may I reserve one minute for rebuttal, please? Your Honors, this case is about District Courts approving a traffic stop by the Reno Police Department using the collective knowledge doctrine in a manner unsupported by this Court's jurisprudence and allowing the officers to prolong the traffic stop in order to deploy a drug sniffing dog. I'm very confused as to what part you think the facts are or what the District Court found with regard to the sequence of events and exactly what your problem is with regard to the collective knowledge. So if you could be really clear about that. In other words, did the, I understand that the original, and I'm going to get their names wrong, but the officer who stopped the car. Officer Beckman stopped the car, Your Honor. Beckman? Beckman. Beckman. He was, we know he wasn't told about the red light, but he was, was he told to stop the car no matter what? Or was he originally told stop the car if you see a traffic violation, and then later told, okay, you can stop the car now? That's one version. There are about 20 testifies to that. So that by the time he did stop the car, Officer Codd had seen the red light and had told him not stop for no reason, but stop. But he didn't tell the reason. Is that your version of it? He did. He did. Officer Codd did see a traffic violation. Right. And he did not tell Officer Beckman what that violation was. He did say stop the vehicle. After he saw the traffic violation. Yes, after he saw the traffic violation. However, Officer Codd was surveilling the Desert Susan Hotel that night in Reno, which is regarded as a high crime area. He saw Mr. Suttis leave his van with another individual, go upstairs to the hotel, stop into a room for a couple of minutes, come back downstairs. So you know this was a pretext for, okay, whatever, what things. Yes. The reason that I do belabor that is that the Officer Codd, without reasonable suspicion of any criminal activity going on, because he didn't investigate anything going on in the room, he then radioed Officer Beckman and said, we have a car leaving, pull the car over. Was that what he said or did he say it? I thought this is what Beckman said. He said, did you see a traffic violation? Pull the car over. No, Your Honor. Your Honor, Officer Beckman testified that Officer Codd, upon leaving the hotel, or Officer Codd, while he was still at the motel, said to Officer Beckman, we have a car that's about to leave, pull it over. I'm sorry, I didn't find it. I know it's not everything you said. He did then himself wait 15 minutes. Officer Codd waited 15 minutes or so, according to Officer Beckman. Why was he waiting? Because he was trying to develop, quote, what they call develop probable cause. He was trying to develop probable cause. Right. So he wasn't just trying to struggle with that probable cause. No, he was not. But he was before there was reasonable suspicion of any criminal activity going on. He didn't tell him, we have a car leaving, pull it over. Can you pull it over? Okay. So you're telling him that is a problem? That's part of what we're telling him. So you're telling him, I'm sorry. The problem is the law here is not so clear about the fact that it's okay to make an activity that's not necessarily intimacy. So if there's one case, it's okay to make it. So, as to which I wrote, it said concurrence. But I concur because that seems to deal with the law. So what exactly are you complaining about? What we're complaining about, Your Honor, is it appears to be an extension of the collective knowledge doctrine beyond what this Court has proved in the past, in that in the past, whether or not if an officer has pulled someone over for a traffic stop or otherwise infringed on their liberty by stopping and talking to them, it's been because the officer, him or herself, has witnessed a traffic or other type of violation or has heard from their counterpart, has witnessed illegal activity. The only hole here is that he didn't say, when he said, okay, light him up, which is what Beckman said, he didn't say because he just saw a cop throw a gun at him. That's part of what we're saying, Your Honor. Yes, or Beckman didn't tell the guy who fired the gun. Beckman did not tell Mr. Smith why he was being held. It's very absurd, but I don't know. But the case law seems to contemplate that you don't have to tell him. Your Honor, but in the case law that I was able to find, that had facts remotely similar to this, I was able to read and reflect knowledge from your case that has facts remotely similar to this, didn't allow such an extension to where an officer that gets pulled over, which is a seizure, had no idea why he was doing that. And Officer Beckman was candid at the evidentiary hearing saying, I don't know why I pulled him over. I was never told that. And when he did pull Mr. Smith over, he didn't tell him why he did it. And Mr. Smith was not cited for a traffic violation, and there was never an indication to him what law he had in front of him, why he was being pulled over. I'm a consulting lawyer for the Oregon Police, and recently I've been involved in this type of situation, and what we've seen is it's a theater movie. After the gun ceases, the red light violation, he tells our Beckman to pull over in the corner. Yes, sir. So the whole reason here is it's not that earlier he said to pull over in the corner, that he saw the red light and things, but Beckman, he thinks the concern is he didn't see Beckman pull it over because he saw the red light violation. Try to have the concern that I have is in any situation, you can imagine all of them is stop that man. You don't have to know your Oregon Police to say, stop that man. I just dropped the jewelry, sir. Do you want the cops that are receiving the message to stop you? And let's find out later whether or not he's in the direction that he's a probable cause for the recent suspicion to stop him. So I don't see one of you guys that you can now say exists and have much of an issue here. Your Honor, the heart of the issue is that before developing even reasonable suspicion of criminal activity, he told Officer Beckman, we have a car leaving here, pull him over. Yes, that's right. I think that he can. As I understand it, he has seen the red light, so now communicating with him again for Beckman to stop the car, I think that we have a better reason that he can. Your Honor, I have a question. Do you know if he really actually left the car? Yes, he did. And in fact, the record is very confusing as to that because at various points he says there was only one call, he says we're due. And I don't know how much that was, maybe it's a function of an interest or a why, but the ultimate finding by the district judge, which seems to have some support in the record, was that as you're representing it, you're also not challenging that there was, in fact, a gratifying problem, even though one of the policemen said it was a criminal problem. Yes, when we did tell at the hearing that nobody did tell Mr. Suttoth what he was. They are not challenged on whether they actually ran a red light. No, we have facts to be able to do that. Yes, but what if he also suggested that the actual problem was that he didn't have a driver's license? Yes, exactly. And that the police were suspended, but that was after he had been stopped, so that didn't become an issue at the hearing. I do agree that the timeline was confusing, and the district court did mention that. That also goes into the second issue here, in that the district court allowed the traffic stop to be prolonged to allow a driver's license being talked without a response. Well, the driver's license being talked didn't seem to have anything to do with anything, though, because, as Margie should clarify this for me, it appears that when we talked to him, they eventually called him out because of the way he was behaving and it struck a shedding, and they thought it was good. All of that was before the drug circumstances that you talked about. No, and that is an area of definite difference between the appellant and the appellee and our arguments at the evidentiary hearing, in that the way Officer Craig, who became involved after the stop, scaled this report, is that Officer Tyndall, who also arrived when the stop occurred, approached the passengers in the van and immediately said, we have a drug-sensing dog on the way, so if there is anybody that has anything here, you better give it up now, or it's to that effect. And so we are saying at that point, supposedly, I mean, honestly, I don't know how much to disappoint, but supposedly, the original officer was in the car checking his I.G. I mean, or checking something that is I.G. This wouldn't have been done in a traffic violation case if nobody had ever talked about the traffic violations. And now that it began is another area of concern, and it's unclear from the record when those documents were checked, or frankly, if they were. And so it's very difficult to start forming a timeline of when the admission of the traffic stop begins, which the case law is very... My time is up, may I have a close-up? All right. So I still might understand, I understand that they called him out after they said the drug-sensing dog was going to come, but before, am I wrong that before the dog arrived, they had already seen the machete in the car? Your Honor, before. I believe that when the dog arrived, they had seen the machete. However, Officer Tittle, they were prolonged... Also, by that point, knew that they were driving with suspensions. They didn't know at that point after the traffic stopped? Right. So at that point, as I understand it, they couldn't have driven the car away anyway. They actually did allow the car to leave that night. That was another turn of events. They could have allowed, they could have impounded, but they did not. Your Honor, may I just finish by saying that Officer Tittle approached the passengers before and heard, at the same time, Officer got going to Officer Beckman to get a drug talk here. There was no one to show drug use, no smell of drugs, no one looking like they were under the influence. But if the dog could arrive, but the dog doesn't want to lay anything, ultimately. Well, that is where we differ, Your Honor, in that they did prolong the traffic stop beyond its original mission by having the drug talk come before they established any reasonable suspicion of drug activity. But they weren't waiting. Yes, but they developed a reasonable suspicion of probable cause with regard to the gun, or maybe not, maybe. When did they find out that I was a felon? They found out that he was a felon after he was removed from the car and after the dog talking. I believe that that was before the talk. Did I get it? No, it wasn't before. All right. Thank you. Yes, ma'am. Yes, Your Honor. Thank you. May it please the Court. Bill Green from the United States. During the evidence you're hearing in this case, the district court carefully dissected the chain of events associated with the traffic stop at issue in this case before finding that the officer lawfully stopped the defendants. Is there an odd traffic stop where you don't tell the person what a missing traffic stop person ever did? I'm sorry, Your Honor. Is there an odd traffic stop where you never tell the person that you stopped not only what you did, but that it's a traffic stop? That's true, Your Honor, but this what probably interrupted the normal course of events is what the district court found to have been the officer safety issue. I think the district court's words were what really transforms this case. This is an officer safety issue. It was no officer safety issue. My understanding is they stopped him, and pretty much the first thing they said is, do you have any trucks you want to tell us because we're having a dog come? Have you never seen or stopped him because we saw him go through a red light or anything else? That's true. There was nothing. No one communicated that to the defendants, but also you saw the traffic violations right there, and then things had unfolded. We had this officer safety issue that could have been communicated to him or probably wouldn't have been communicated to him, but for the officer's terms of this three-foot-long machete, it was just as the district court found it. What I think he had stopped were traffic violations, which I have. The police force officer, he says, the city public safety officer, and he says, oh, you did X. That was all, I mean, that's immediate. It's not something that, and then they take your ID, and he already said he was there. They took his ID. They maybe wrote something down. He didn't even say he took his license. It was just not handled as a traffic violation. As the district court found, there was no dispute that there was a traffic violation. It was handled probably a little differently because of what the officers had seen. They were a little concerned about the possible drug activity, but here, the evidence were superseded or interrupted by this machete, which was seen very quickly on the officers. When he saw this, when he saw the machete, he asked the defendant if he could arrive today to get out of the car. I'm wrong. Didn't he always say he saw the machete just because he brought up the drugs before he brought up anything else? The reason he saw the machete, Your Honor, is because the defendant started acting, started moving around, making furtive movements. He saw it. Well, the furtive movement has already been implied anyway. Because the very first thing he said was, where can I bring the drug? Before I say anything else. There's no question that certainly excited the defendant when he heard that language, but there was nothing. There was nothing that was impermissible about the officer making that statement. And had the dog, as Your Honor did earlier, a loaded narcotics dog prolong the traffic stop, as the district court found, it might have been a different outcome before the district court. But the officers, when they noticed the defendant acting, they could have asked him to get out of the car. They had a right to do that without even seeing him making the movements that the district court credited their testimony having testified to. They could have asked him to get out of the car. They did ask him to get out of the car. They see this misdemeanor, the defendant, when the officer asked him. But when they said that they saw the machete, so they put it on the right side of the driver's seat, so they don't have to see both of the driver's seat. Is that right? I believe the testimony was, if I understand Your Honor's question, Officer Craig was standing next to the driver's window, and he sees the machete. He's the one that saw the machete. And where was it? The testimony was the machete was between the driver's door and the driver's seat. But the gun was on the other side. The testimony, as I understand it, the gun was between the driver's seat and the passenger seat on the floor. Right. So he'd have to see that in the dark, standing by the window on the floor on the other side of the driver's seat. I believe the same officer testified he saw that after he asked the defendant to get out of the van, and the door was open is where he saw, I think he said, the handle of a gun in a holster, which testimony, again, the district court credited. His testimony was that this was a well-lighted parking lot, in a casino parking lot. So at one time, this is an officer that should have been caught in the middle of a traffic violation. I understand it. As I understand it, the testimony here from the transcript, both officers picked the car, immediately knew from the radio transmissions about this traffic situation. They could have said, you know, you might as well have just been too. Certainly. Okay. It may have been a better practice, but there's no requirement, legal requirement for them to have done that. But they certainly could have. They had full knowledge of it. Their testimony. The officer back when he made the stop, though, he was the one that did not know why he was asked to stop the van, but under the collective knowledge doctrine, certainly made a lawful stop of the van because the officer was gone. Okay. So the officers used the red and red light, and they said, yes, my wife's in the hospital, I have to get there as soon as possible. They're probably not saying anything. It's ordinarily, you know, people have occasionally had a lot of last cases. It's rather disordered if you stop somebody in their driveway. I understand it's a pretext, but at what point are we going to let the pretext just take over the whole thing and that's really what's going on here? Well, in addition, Your Honor, in addition to the discord about the testimony, was it within ten seconds of the stop, the officers knew that the van was. Well, that's also possible. I don't even understand what that's about. I mean, there were two stories there. I mean, who was it who heard. My understanding was that they knew that so they went back to his yard and called, either called his specialist, appealed to her and found out there was some speculation, so they told other people, how about the last ten seconds? Your Honor, I think the difference has to be I'm having to speculate and go outside the record. I don't know if I'm doing that good to officers. I think it's common knowledge to have. You know, radio capabilities, I think it's also justified he had a computer as well. Yeah, so this car, he had to go back to the car, that's what he said. So he got back to the car and he had to do that and it just couldn't be in ten seconds. There was something wrong with the timer. Well, it counts as close to 12 if I can interject, but that's just a big lie because I might be speculating, but I had assumed that Decker had called in the plates before he made the stop, but because it was said that they told him the plates were suspended within like an hour, less than a minute after the stop. It seems too fast, but I would think a lot of police in the position of Beckman following the car might have called in the plates. Does the record tell us anything? Your Honor, the record leads to just the reasonable inference that, Your Honor, it's just made, but the record is lacking. Well, maybe somebody else called in it because they must have seen the license plates. I mean, one thing about what your opponent is quite right is that this is a very murky record in terms of the circumstances here. I've looked at many things, including this. It's just, I mean, in 10 seconds, I just didn't pee the right off. It's impossible. So there's something else that happened. I mean, no idea what it is. Well, I think now that Judge Gould has said it, I was reluctant to suspend. I could go out to the record, but I thought, wait. Judge Gould just hit the nail on the head. They must have called the plates in. Officer Beckman must have done it before the stop, and then the information came back over the radio transcript, and the radio transcript was introduced as an exhibit, and it did come back within 10 seconds. I agree with Your Honor, it does sound incredulous, but I think Judge Gould has spurred that up exactly. This is a case where the district court was just all over it. I don't know if Your Honor is familiar with the transcript, but the district court was all over the testimony. It played a very active role, questioned every witness multiple times, interjected, because it was a confusing record. I think the district court went so far as to say that. It sounded a lot like me, which is how far we can let this pretext go. Essentially, it wasn't happening either. Because that's really what's going on. We're just pushing it and pushing it. And here we have a situation where they don't even tell the driver, this is a traffic stop. I mean, even assuming the time sequence, and we're assuming nobody tells the driver, this is a traffic stop, there's no driver, this is a traffic stop. There's no record that they ever actually called in the ID or the license or anything. I mean, there's just no way in which they've admitted this is a traffic stop. Maybe they would if they hadn't seen you standing there. Your Honor, my time is up. Thank you for your testimony. Thank you. We'll give you one minute, everyone. I just want to be clear that, and this is in the record, that there were no drugs found in the van, and that the machete should not have been considered, and we did argue this, inherently suspect, and that Mr. Sudduth did have a working van, and it said on the back there, I'm assuming you can explain why you think he was with machetes, but I don't know. I believe that he did have part of it. I wondered that too. He did have a, you know, part of his work was doing law service, and if the machete could have been reasonably used in that situation, I do understand how the officer would be alarmed by that, but it is important to know that the way that the report is styled and the way that the testimony came out is that the machete was not found, and certainly the gun was not, until after Officer Tyndall talked to them about a drug deal. Can I just say that that's a very important fact for the court to know, that that's where we are arguing the unreasonable delay comes in that was not supported by this investigation. I mean, okay, they talk to the officers. How are you going to ask them to question a question that keeps them there as long as they will have a place for the talker to come? And there was a 10-minute delay, which, in Rodriguez's case, was pretty much all taken up with taking the guy out of the car and seeing the machete and seeing the gun and having him talk about the felony and all that. I mean, that's about 10 minutes, and by that time they had probable cause to arrest him for the gun. Well, Your Honor, the problem with that is that the delay started, the reasonable delay we're arguing started when Officer Tyndall came up to the car without any reasonable suspicion of drug activity, and the concern, as the pretext is, just goes further and further in that there is a significant potential for an officer of use in a case like this. I'm not saying that happened with the Reno Police Department here. However, an officer could just tell another officer, pull that person over without that officer having any reason why, and that is a seizure under our law. That's a significant infringement on liberty without knowing the reason why. So thank you, Your Honor. I'm sorry if I was giving you a useful argument. In the case of New Orleans, James vs. Smith, we will go to a third case, Houghton vs. University of New York. Thank you.
judges: Gould, Berzon, Garbis